**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**GRASSHOPPER GARDENS, INC.,**

                             **Plaintiff,**

   **vs.**                                       **1:23-CV-1257**
                                                      **(MAD/PJE)**

**PMA MECHANICAL LLC,**

                             **Defendant.**

_____

**APPEARANCES:**                            **OF COUNSEL:**

**BARTLETT, PONTIFF, STEWART &**     **JOHN D. WRIGHT, ESQ.**
**RHODES, P.C.**                          **JEFFREY B. SHAPIRO, ESQ.**
One Washington Street
P.O. Box 2168
Glens Falls, New York 12801-2168
Attorneys for Plaintiff

**HESLIN, ROTHENBERG, FARLEY &**     **RACHEL L. PEARLMAN, ESQ.**
**MESITI, P.C.**                          **BRETT M. HUTTON, ESQ.**
5 Columbia Circle                       **THOMAS L. SICA, ESQ.**
Albany, New York 12203
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**[1]

      Plaintiff commenced this action on October 10, 2023, asserting claims of federal

trademark infringement, unfair competition and false designation of origin, and various related

claims under New York State law. _See_ Dkt. No. 1. Currently before the Court are the parties'

_____

     [1] For sake of clarity, citations to page numbers in the parties' submissions refer to the
pagination generated by the Court's electronic filing system, CM/ECF.

cross motions for summary judgment and Defendant's motion to exclude the expert testimony of Dr. Eli Seggev.  *See* Dkt. Nos. 34, 35 & 46.

## II. BACKGROUND

### A.    Plaintiff is a Lawncare and Landscaping Services Provider

Plaintiff is a New York corporation having an office and place of business at 318 Mott Road, Gansevoort, New York 12831.  *See* Dkt. No. 46-2 at ¶ 1.  Plaintiff provides in person lawncare services and landscaping services, including plant installation and snow removal services, and sells products for use in these services (*e.g.*, trees, shrubs, perennials, mulch, topsoil, grass seed, and ice melt).  *See id.* at ¶ 2.  Plaintiff has offered the same lawncare and landscaping services over the past twenty-five years, with the only change being between 2020 and 2024 when Plaintiff began selling plants on its website.  *See id.* at ¶ 3.  Plaintiff has never bid against Defendant or lost any business to Defendant for any landscaping, hardscaping, plant installation, and/or snow removal services.  *See id.* at ¶ 4.  Plaintiff does not now provide, offer, promote, or advertise and has never provided, offered, promoted or advertised any products or services which are provided by Defendant, including, for example, air conditioning contractor services, heating contractor services, HVAC contractor services, installation, maintenance, and repair of heating, cooling, HVAC systems, and equipment installation, maintenance, and repair of furnaces, installation, maintenance, and repair of indoor air quality equipment, and indoor plumbing.  *See* Dkt. No. 35-1 at ¶ 6.[2]

### B.    Plaintiff's Registered Trademarks

---

[2] The Court notes that Plaintiff has denied this statement of material fact, but has not provided citation to any evidence in the record in support of its denial.  *See* Dkt. No. 46-2 at ¶ 6.

On November 1, 2006, John DeLisle, the founder and president of Plaintiff, filed a trademark application with the U.S. Patent and Trademark Office ("USPTO") directed to the logo



("DeLisle Logo") for "[h]ardscaping services; Installation and maintenance of irrigation systems; Snow removal services" and "[g]arden or flower bed care; Garden tree planting; Landscape gardening; Landscape gardening design for others," which was assigned U.S. Trademark Application Serial No. 77034088 ("the '088 Application"). *See* Dkt. No. 35-1 at ¶ 7; Dkt. No. 46-2 at ¶ 7; Dkt. No. 46-3 at ¶ 7.

In an Office Action issued by the USPTO on March 13, 2007, during the prosecution of the '088 Application, the USPTO refused registration of the DeLisle Logo based on U.S. Trademark Registration Nos. 1,057,404 and 1,000,234 directed to the marks "GRASSHOPPER" and "GRASSHOPPER (and design)" for "riding power mowers" (collectively, "Cited Registrations") because the DeLisle Logo, when used on or in connection with the listed services, so resembles the Cited Registrations as "to be likely to cause confusion, to cause mistake, or to deceive." The USPTO also broadly categorized the services offered by both as "lawn care." Dkt. No. 46-2 at ¶ 8. In response to this Office Action, Mr. DeLisle argued that his services listed in the '088 Application are "strictly for landscaping" and categorized them as "lawn care services" and claimed that his consumers were sophisticated. *See id.* at ¶ 9. As a result of the arguments by Mr. DeLisle to the USPTO during prosecution of the '088 Application, the USPTO allowed the

DeLisle Logo to register on June 24, 2008 as U.S. Trademark Registration No. 3,451,872 ("the '872 Registration"). *See id.* at ¶ 10.

According to Defendant, at the time the complaint was filed in this action, the '872 Registration was owned by John DeLisle, individually. *See* Dkt. No. 35-1 at ¶ 11 (citing Dkt. No. 1-1; Dkt. No. 35-11). Without citing to any evidence in the record, Plaintiff denies this assertion, claiming that Mr. DeLisle had "assigned ownership of the trademark to Plaintiff." Dkt. No. 46-2 at ¶ 11. During discovery in this case, six months after its commencement, Plaintiff produced a *nunc pro tunc* assignment dated April 16, 2024, that purportedly assigned the '872 Registration from Mr. DeLisle to Plaintiff. *See* Dkt. No. 46-2 at ¶ 12.

On March 16, 2023, Plaintiff filed a trademark application at the USPTO for the word mark GRASSHOPPER GARDENS INC. ("Plaintiff Application") for

> Hardscaping services; Installation and maintenance of irrigation systems; Snow removal services; pest control services in homes; soil slope erosion and control services and sediment control services; soil erosion control services in the nature of shoreline and bank stabilization; masonry; snow and ice removal services; masonry services; home outdoor maintenance and cleanup services; planning and layout design services for home patio and outdoor space and construction and maintenance of home patio and outdoor space, in class 37; and

> Garden and flower bed care; garden tree planting; Landscape gardening; Landscape gardening design for others; Lawn mowing services; lawn cleanup services in the nature of lawn care services; lawn care services; lawn fertilization services; lawn care services in the nature of mulch and mulch blowing services; lawn care services in the nature of plant trimming and pruning services; lawn care services, namely, mechanical seeding; lawn care services in the nature of ornamental root feeding; landscape design in the nature of outdoor fireplace and fire pit design and installation; landscape design in the nature of outdoor kitchen design and installation; landscape design in the nature of pool landscape design; lighting design and installation; landscape design in the nature of patio and walkway design and installation; landscape design in the nature of tree and plant installation; landscape design in the nature of trees,

shrubs perennials, grass seed planting and maintenance services;
landscape design, in class 44,

which was assigned U.S. Trademark Application Serial No. 97842873 ("the '873 Application").

*See* Dkt. No. 46-2 at ¶ 13.

During the prosecution of the '873 Application, the USPTO did not refuse registration

over any active registration or pending trademark application, including the U.S. trademark

registrations owned by PMA, which existed at the time Plaintiff filed the '873 Application. *See*

*id.* at ¶ 14. The USPTO allowed the work mark GRASSHOPPER GARDENS INC. to register on

July 23, 2024, as U.S. Trademark Registration No. 7,453,500. *See id.* at ¶ 15.

## C.    Plaintiff's Customers

According to Plaintiff, its customers are varied and come from a variety of income

brackets. *See* Dkt. No. 46-2 at ¶ 16. In its marketing efforts, however, Plaintiff typically targets

individuals with an annual income of at least $150,000 because "people of that income level have

money to spend on their properties or care to." *Id.* at ¶ 17. Plaintiff's average customer will spend

between $1,000 to $2,500 per year on its services. *See id.* at ¶ 19. Ninety-five percent of

Plaintiff's new customers will not hire Plaintiff over the phone, but, rather, will hire Plaintiff only

after an in-person consultation. *See id.* at ¶ 20.

## D.    Defendant and Its Adoption and Use of the PMA Marks

Defendant PMA Mechanical LLC ("PMA") is a New York limited liability company, with

its office currently located in Clifton Park, New York. *See* Dkt. No. 46-2 at ¶ 21. Defendant's

services were originally limited to offering commercial heating, ventilation and air conditioning

("HVAC") equipment installation. *See id.* at ¶ 22. Amanda Triolo is Defendant's owner and chief

executive officer. *See id.* at ¶ 23.

According to Ms. Triolo, Defendant decided to rebrand its business in early 2020 and, to assist in the rebranding, Defendant hired the company KickCharge Creative ("KickCharge"). *See* Dkt. No. 35-1 at ¶¶ 24-25. When Defendant first approached KickCharge, Ms. Triolo did not initially contemplate changing Defendant's name from PMA Comfort Solutions, which Defendant was using at the time. *See id.* at ¶ 26. In response to a survey completed by Ms. Triolo on behalf of Defendant, KickCharge conducted market research and sent Defendant various name options to consider. *See id.* at ¶ 27. KickCharge initially suggested four or five different names, which Defendant rejected. *See id.* at ¶ 28. During a second round of suggestions, KickCharge proposed the name "grasshopper," which was conceived by Dan Antonelli, the owner of KickCharge. *See id.* at ¶ 29; *see also* Dkt. No. 35-15 at 2-3. During this process, Defendant claims that neither it nor KickCharge was aware of Plaintiff, its trademarks, the DeLisle Logo, or Plaintiff's business in general. *See id.* at ¶ 30; *see also* Dkt. No. 35-14 at 12-13; Dkt. No. 35-15 at 4.

Before it committed to use the name "grasshopper" in commerce, Defendant hired the Internicola Law Firm to conduct a trademark clearance search. *See* Dkt. No. 46-2 at ¶ 33. Charles Internicola, an attorney at the Internicola Law Firm, conducted the search and reviewed the results. *See id.* at ¶ 34. During the search, the Internicola Law Firm uncovered the '872 Registration for the DeLisle Logo. *See id.* at ¶ 35. Based on the results of the trademark clearance search, including the presence of the '872 Registration, the Internicola Law Firm provided a legal opinion to Defendant opining that Defendant could move forward with registering "Grasshopper" for HVAC services. *See id.* at ¶ 36.

After receiving the search results and this initial analysis, Defendant requested a further legal opinion from the Internicola Law Firm to confirm that there would be no issues with the use of its proposed marks if Defendant moved forward with the "Grasshopper" name. *See id.* at ¶ 37;

*see also* Dkt. No. 35-3 at ¶ 8; Dkt. No. 35-17. In response to this request, Mr. Internicola, through his legal assistant, provided a supplemental opinion, opining that the use of the mark "Grasshopper" for heating and cooling would obtain registration at the USPTO and that use of the mark would not create a likelihood of confusion when compared to the marks uncovered in the Internicola Law Firm's clearance search. *See id.* at ¶ 38; *see also* Dkt. No. 35-17 at 2-4. Subsequent to these written opinions, Ms. Triolo spoke with Mr. Internicola to discuss his opinion that Defendant was clear to use its "Grasshopper" marks in commerce based on the results of his clearance search. *See id.* at ¶ 39.

According to Ms. Triolo, she relied on these written and oral opinions in deciding to proceed with the use of "Grasshopper" as a trademark to identify its HVAC services. *See* Dkt. No. 35-3 at ¶ 12. On February 1, 2021, Defendant launched its re-branded name "Grasshopper Heating & Cooling." Dkt. No. 46-2 at ¶ 41.

Under the name "Grasshopper Heating & Cooling," Defendant provides the following services:

> Heater contractor services, furnace inspection, repair, replacement, installation and maintenance, heat pump inspection, repair, installation and replacement, boiler inspection, repair, replacement, installation and maintenance, air conditioning contractor services, HVAC contractor services, installation, maintenance and repair of heating, cooling, HVAC systems and equipment, installation, maintenance and repair of furnaces, installation, maintenance and repair of indoor air quality equipment, air conditioning inspection, repair, installation, and maintenance, ductless air conditioning inspection, repair, installation and maintenance, indoor air purification system inspection, repair, installation and maintenance, indoor air filtration system inspection, repair, installation and maintenance, UV light system inspection, installation, repair, and maintenance, water heater inspection, installation, repair, maintenance, and replacement, HALO water treatment system inspection, installation, repair, maintenance, and replacement, and home water filtration system inspection, installation, repair, maintenance, and replacement.

*Id.* at ¶ 42.  Defendant does not provide, and claims that it has no intention of providing, any services relating to lawncare or landscaping services under its "Grasshopper" marks.  *See* Dkt. No. 35-1 at ¶ 43; *but see* Dkt. No. 46-2 at ¶ 43 (denying this assertion and noting that "Defendant used the mark in collaboration with Hedgehog Lawncare").  Defendant is not in competition for any of its services with Plaintiff and Defendant and Plaintiff do not compete for any of the same jobs.  *See* Dkt. No. 46-2 at ¶¶ 44-45.

### E.    Defendant Registered Trademarks for its Grasshopper Brand

On November 12, 2020, Defendant, through the Internicola Law Firm, filed a U.S. trademark application with the USPTO, which was assigned U.S. Trademark Application Serial No. 90315118 ("the '118 Application") for the word mark "Grasshopper" for:

> Air conditioning contractor services; Heating contractor services; HVAC contractor services; Installation, maintenance and repair of heating, cooling, HVAC systems and equipment; Installation, maintenance and repair of furnaces; Installation, maintenance and repair of indoor air quality equipment.

Dkt. No. 46-2 at ¶ 46.

During prosecution of the '118 Application, the USPTO did not reject the "Grasshopper" mark based on any pre-existing registration or pending application owned by any third party.  *See id.* at ¶ 47.  The word mark "Grasshopper" in the '118 Application published for opposition on May 25, 2021, and Plaintiff did not oppose registration of this mark.  *See id.* at ¶ 48.  The '118 Application registered as U.S. Trademark Registration No. 6,522,329 on October 21, 2021.  *See id.* at ¶ 49.

Defendant, through the Internicola Law Firm, filed a federal trademark application with the USPTO, which was assigned U.S. Trademark Application Serial No. 90306984 ("the '984 Application") for Defendant's Logo  for:

> Air conditioning contractor services; Heating contractor services; HVAC contractor services; Installation, maintenance and repair of heating, cooling, HVAC systems and equipment; Installation, maintenance and repair of furnaces; Installation, maintenance and repair of indoor air quality equipment.

*Id.* at ¶ 50. During prosecution of the '984 Application, the USPTO did not reject Defendant's Logo mark based on any pre-existing registration or pending application owned by any third party; the only rejection during the prosecution was related to a perceived mismatch between the specimen and the drawing of the mark. *See id.* at ¶ 51. Defendant's Logo in the '984 Application published for opposition on June 1, 2021, and neither Plaintiff nor any other individual opposed registration of this mark. *See id.* at ¶ 52. The '984 Application registered as U.S. Trademark Registration No. 6,695,358 on April 5, 2022. *See id.* at ¶ 53.

## III. DISCUSSION

**A.    Motion to Exclude the Expert Testimony of Dr. Eli Seggev**

Plaintiff retained Dr. Eli Seggev to conduct a survey on the likelihood of confusion between the marks at issue in this case ("Seggev Survey" or the "Survey") and to provide an expert report and testimony.[3] Defendant seeks to preclude use of this evidence under Rules 702

---

[3] In response to Dr. Seggev's expert report, Defendant produced a rebuttal expert report by their own expert, Dr. Annabelle Sartore. *See* Dkt. No. 34-13.

and 403 of the Federal Rules of Evidence. *See* Dkt. No. 34-1. As set forth below, Defendant's motion is granted.

### *1. Structure of the Seggev Survey*

The Seggev Survey used a format referred to as an original "*Squirt*" survey. *See* Dkt. No. 34-4 at 16-17. The Survey is comprised of two parts: a screener portion and the main questionnaire. *See* Dkt. No. 34-3 at 8-9. The Survey followed a "Test v. Control" design, "in which the impact of an allegedly infringing stimulus (Test Group) is compared to the impact of a similar stimulus that is free of the allegedly infringing elements (Control Group)." *Id.* at 3. The "Test" design compared a portion of Plaintiff's website page <u>without its URL</u> to a portion of Defendant's website page <u>without its URL</u>, while the "Control" design compared the portion of Plaintiff's website page to a portion of a completely random website for an HVAC contractor called "Best Contractors" <u>with the URL</u> "besthvac.contractors" included. *See id.* at 23-24. The images of both Plaintiff's and Defendant's portions of websites included the word "grasshopper" while the "Best Contractors" website page did not include the word "grasshopper" or any other similarities to the other website pages. *See id.* Dr. Seggev testified that he intentionally designed the Survey this way to lead participants towards his own conclusion that the marks at issue "were identical." *Id.* at 20-21.

### *2. Operation of the Seggev Survey*

Plaintiff and Dr. Seggev could not provide Defendant an actual working version of the Survey. *See* Dkt. No. 34-8. As a result, Defendant was limited to the snapshots of the Survey attached as Exhibit 4 to the Seggev Expert Report to reconstruct the purported operation of the Survey. Defendant contends that this results in a significant disadvantage to it and this Court in

determining the actual operation of the Survey and raises significant reliability issues regarding the Survey itself. *See* Dkt. No. 34-1 at 8.

The Survey participants were either shown the "Test" group or the "Control" group, not both. *See* Dkt. No. 34-4 at 15. Participants randomly selected for the "Test" group were first asked to review "a webpage" and then shown images of both the portion of Plaintiff's webpage without its URL and the portion of Defendant's webpage without its URL. *See* Dkt. No. 34-3 at 23-24. For this "Test" group, the Survey does not include a question separating the portions of Plaintiff's website and Defendant's website, creating the impression that they came from the same website because each of the URLs were removed and the question just prior refers to just "a website." *Id.* at 23. Alternatively, participants selected for the "Control" group were presumably shown the same portion of Plaintiff's website without the URL and then asked to review the top portion of another website for Best Contractors with the URL "besthvac.contractors." *Id.* at 24.

After being shown these images in the "Test" or "Control" groups, participants were then asked whether they thought the websites represented "the same company," "different companies," or "don't know/no opinion." *Id.* at 25. Participants in both groups were then asked whether they believe that "the two companies are affiliated, connected, or associated with one another or have no opinion." *Id.* at 26. Survey participants were then asked about their highest level of education and their household income range. *See id.* at 26-27. The Survey participants were "among a sample of the general population," which Dr. Seggev refers to as the entire United States. *See id.* at 2.

### 3. Results of the Seggev Survey

According to the Seggev Report, participants were classified as confused if they considered the two images to be the "same company" or "companies that are affiliated, connected

or associated with each other." Dkt. No. 34-3 at 9.  Based on the results of the Survey, Dr. Seggev

claims that 68.3% of participants found a likelihood of confusion for the "Test" group.  *See id.*

And, the results of the "Control" group showed that 28.1% of participants believed that Plaintiff

and Best Contractors were also either the same company or "affiliated, connected or associated

with each other." *Id.*  Dr. Seggev did not vet the results based on household income level or

whether the Survey participants were appropriate prospective consumers of Defendant's services.

*See* Dkt. No. 34-4 at 8-10.  Additionally, Dr. Seggev did not focus on the marketplace in which

both parties currently operate; instead, he conducted a nationwide survey.  *See* Dkt. No. 34-3 at 2.

### *4. Applicable Legal Standards*

Federal Rule of Evidence 702 gives an expert witness testimonial latitude unavailable to

others, "so long as the witness is 'qualified as an expert' and (1) 'the testimony is based on

sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and

(3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *United*

*States v. Pryor*, 474 Fed. Appx. 831, 834 (2d Cir. 2012) (quoting Fed. R. Evid. 702).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of

the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v.*

*Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  As the Supreme Court emphasized in *Daubert*, it is

the Court's duty to act as a "gatekeep[er]," ensuring that an expert's testimony "both rests on a

reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579, 597 (1993).  The Court's task "is to make certain that an expert, whether

basing testimony upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The Second Circuit instructs district courts to exclude expert testimony if it is "speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Courts should also exclude "'testimony that usurp[s] either the role of the trial judge instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (quotation omitted). Finally, as with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or delay. *See Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 465 (S.D.N.Y. 2014).

"'[C]ourts have long held that consumer surveys are the most persuasive evidence of'" actual confusion in trademark cases. *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 123 (S.D.N.Y. 2022) (quoting *LVL XIII Brands*, 209 F. Supp. 3d at 638-39). "'To evaluate the validity and reliability of a survey, a court should consider whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.'" *Id.* (quoting *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 449-50 (S.D.N.Y. 2017)) (other citations omitted); *see also Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738 (S.D.N.Y. 2011); *Limited v. Macy's Merch. Grp., Inc.*, No. 15-cv-3645, 2016 WL 4094913, *8-9 (S.D.N.Y. Aug. 2, 2016), *aff'd*, 695 Fed. Appx. 633 (2d Cir. 2017). "A 'survey suffer[ing] from substantial methodological flaws ... will be excluded under both Rule 403 and

13

Rule 702.'" *Capri Sun GmbH*, 595 F. Supp. 3d at 123 (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007)).  "'In cases arising under the Lanham Act, the Court's gatekeeper function is of heightened importance because the pivotal legal question virtually demands expert survey research on issues such as consumer perception.'" *Id.* (quotation omitted).  "And '[w]here, as here, a trademark action contemplates a jury trial rather than a bench trial, the court should scrutinize survey evidence with particular care.'" *Id.* (quoting *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010)).

### 5. Application

Today, most likelihood of confusion surveys follow either an "*Eveready*"[4] or "*Squirt*"[5] format.  As noted by Defendant's rebuttal expert, Dr. Sartore, in the 1980s, the *Squirt* research design consisted of exposing survey respondents to both a plaintiff's and a defendant's marks simultaneously and asking the relevant survey questions.  *See* Dkt. No. 34-13 at 7.  Due to concerns regarding the leading nature of this approach, the *Squirt* research design has been modified.  *See id.*  Today, a simplistic explanation is that survey respondents being queried with a *Squirt* format are typically exposed to the plaintiff's mark and then to the defendant's mark along with several other non-infringing marks, and queried as to the relationship(s), if any.  *See id.* at 7-8 (citations omitted); *see also* Dkt. No. 34-4 at 17-19.  According to Dr. Sartore, the inclusion of several other non-infringing marks in the execution of the "*Squirt*" methodology has evolved due to the suggestive nature, and its impact on the results, of just showing a plaintiff's mark and a defendant's mark and asking the survey questions.  *See id.* at 8.  The newer format for a *Squirt* survey, when appropriate, is to show one of the trademarked products by itself, followed by a

---

[4] *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976).

[5] *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980).

lineup or array that includes the other product or trademark and other similar products or trademarks. *See id.*; *see also* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy on Trademarks") § 32:177 at 32-377 to 32-378 (2008) (describing "line-up" survey methods, "[a] more subtle form of '*Squirt*' survey"). The respondent is then asked whether they believe the first product they saw was made or put out by the same source as any of the products in the lineup. *See id.* In this format, the control group are then shown a second array which lacks the relevant trademarked product. *See id.* The percentage of people in the control group who found an affiliation between the first product and any product in the array is then subtracted from those in the experimental group who found an affiliation between the first product and the trademarked product in the array as a way of "filtering noise (i.e., other factors which could mistakenly contribute to an impression of confusion)." *Id.*

Here, Dr. Seggev utilized the original formulation of the *Squirt* survey, showing participants either (1) portions of images of Plaintiff's website and Defendant's website in the Test cell, or (2) portions of images of Plaintiff's website and "the webpage of a heating and cooling business that did not use the Grasshopper" in the Control group. *See* Dkt. No. 34-3 at 6. As illustrated in Dr. Seggev's report, the Survey showed participants both images consecutively. *See id.* The Court agrees with Defendant and Dr. Sartore that, in showing only two images consecutively, without any other similar trademarks/companies, in artificially close proximately for two non-competing companies, the Survey intentionally signals to participants that there is a connection between the two and thereby artificially inflates the Survey's estimates of likelihood of confusion. *See Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06-cv-550, 2007 WL 225688, *8 (S.D.N.Y. Aug. 6, 2007). In this case, the seriatim display of non-competing companies' websites was impermissibly leading.

Moreover, after viewing the seriatim display, the Survey respondents were given a multiple choice question in which they were asked the following: "Do you think the two webpages you have just looked at represent the same company, different companies, or you don't know?" Dkt. No. 34-3 at 25. Rather than measure any actual confusion, however, these questions were far more likely to generate "demand effects" by suggesting the existence of a connection between the webpages that the respondents would not have made on their own. As one court has explained, "[t]he question about whether the two [non-competing] items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (D. Ind. 2000); *see also Gov't Employees Ins. Co. v. Google, Inc.*, No. 1:04-cv-507, 2005 U.S. Dist. LEXIS 18642 (D. Va. Aug. 8, 2005) ("[D]emand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants"). In other words, the mere putting of a question creates the impression of a relationship.

In *Kargo Global, Inc.*, the court found survey questions leading where the respondents were shown the marks "cargo" and "kargo," and then "asked whether they believed a connection, as to source, business relationship, or sponsorship, existed between the companies whose marks the respondents had just seen." *Id.* at *8. The *Kargo* court explained that "[u]nder such circumstances, the respondents who later stated that they believed that there was a connection between Cargo and Kargo due to the similarity of the names, and thus were tallied as 'confused',

16

were demonstrating merely that they had read the names 'cargo' and 'kargo' in artificially close proximity." *Id.* at *9. "Certainly, in light of the non-competing nature of the products at issue, the multiple choice questions that immediately followed the display of the marks implied connections or associations that otherwise would not have occurred to the respondents." *Id.*

The leading nature of the Survey's design is further evidenced by the Control group's responses. The Control group was shown two images. One images was of Plaintiff's website with the DeLisle Mark prominently displayed (the anthropomorphic grasshopper), along with links for the viewer to see the lawncare and landscaping services that the company provides. *See* Dkt. No. 34-3 at 23. The other image was of Best Contractor's website, which includes a picture of the Albany, New York skyline, and notes that the services they provide are as follows: "Cooling repairs, AC Replacement, Heating Repair, Furnace Replacement, Cooling, Heating Contractors." *Id.* at 25. There is simply no logical explanation (other than the leading nature of the Survey) that over 28% of participants in the Control group answered that the webpages were offered by the "same company" or "companies that are affiliated, connected, or associated with each other." *Kargo Global, Inc.*, 2007 WL 2258688, at *9-10 (noting that the leading and flawed nature of the survey at issue was further demonstrated by the high number of control group participants that found a connection between non-infringing control product and the defendant's allegedly infringing product). Moreover, the Survey made use of an inadequate control stimulus, considering the significant differences in their respective visual appearances, names, and the business each are engaged in. *See Limited v. Macy's Merchandising Grp.*, No. 15-cv-3645, 2016 WL 4094913, *10 (S.D.N.Y. Aug. 2, 2016) (holding that the survey used an inadequate control stimulus because of the considerable differences in the two webpages); *see also THOIP*, 690 F. Supp. 2d at 240 ("Without a proper control, there is no benchmark for determining whether a

likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology").

Defendant further contends that the Seggev Survey is flawed because it used a flawed methodology based on the facts of this case. *See* Dkt. No. 34-1 at 17. The Court agrees. Courts have found that the *Squirt* format is intended to replicate market conditions under which the relevant services have marketplace proximity and is therefore most appropriate where the marks are sold to overlapping customers or through overlapping channels of trade, such that consumers would typically encounter one soon after the other. *See Hypnotic Hats, Ltd. v. Wintermantel Enter., LLC*, 335 F. Supp. 3d 566, 596 (S.D.N.Y. 2018). "[Th]is necessary because, if the products are not 'directly competing or complementary goods/services with identical or substantially overlapping consumers,' then 'respondents who report a "connection" due to the "similarity of names" are demonstrating merely that they had read the names ... in artificially close proximity.'" *Id.* (quoting *Kargo Global, Inc.*, 2007 WL 2258688, at *9); *see also THOIP*, 690 F. Supp. 2d at 235 (agreeing with the expert testimony opining that "'a sequential presentation of the two marks at issue (or array [including controls]) is appropriate only if it reflects a significant number of real world situations in which both marks at issue are likely to be evaluated sequentially or side-by-side'") (quotation omitted). "However, courts define proximity in the modern marketplace broadly." *Hypnotic Hats, Ltd.*, 335 F. Supp. 3d at 597. "A court must consider 'products that, while infrequently seen side-by-side, are (i) complementary and/or (ii) purchased by substantially overlapping consumer groups – that is, that are seen by consumers in sufficiently tight timeframes, sufficiently often, so as to present realistic comparative opportunities.'" *Id.* (quoting *Swann, Eveready and Squirt — Cognitively Updated*, 106 T.R. 727, 743-44 (2016)).

Here, there is no competitive proximity between the parties. Although the complaint alleges that both companies purportedly offer "home maintenance service" or "home services," this allegation contradicts the statements made in defining the services and marketplace during prosecution of the DeLisle Logo before the USPTO to overcome pre-existing registrations including the word "grasshopper" for "riding lawn mowers." Dkt. No. 34-9 at 4. During prosecution, Plaintiff's services were described as "strictly for landscaping" and "broadly categorized as 'lawn care.'" *Id.* Defendant, however, provides HVAC services and its business does not overlap with Plaintiff's in any appreciable manner.

Moreover, there is limited proximity of the marks in the marketplace. Although both companies operate websites that present the services they offer, that is where the proximity ends. And, as admitted by Dr. Seggev, consumers would not encounter Plaintiff's and Defendant's websites in a web search unless they specifically searched for HVAC and landscaping providers in the same query. *See* Dkt. No. 34-4 at 6-7. Where, as here, the marks are not typically in marketplace proximity, the *Squirt* survey creates artificially close proximity that overestimates confusion. *See Limited*, 2016 WL 4094913, at *9.

While these flaws alone are likely sufficient to justify the exclusion of Dr. Seggev's report and the Survey, Dr. Seggev's admitted bias in administering the Survey convinces the Court that exclusion is the only appropriate course. As noted above, Dr. Seggev testified that he intentionally designed the Survey the way he did to lead participants towards his own conclusion that the marks at issue "were identical." Dkt. No. 34-4 at 20-21. Specifically, during his deposition, Dr. Seggev provided the following testimony:

> Q.    Okay. So, a while ago, there was a – so, you've mentioned
>        this is a *Squirt* survey. There is another way of doing a
>        *Squirt* survey, too; right? Like a newer way?

A.    Yeah.

Q.    All right.  I want to make sure that I have the details right.
So the newer way, from my understanding, is that the
allegedly – infringing product mark service is put in an array
with a group of ... not infringing one, yeah.

A.    Yes.

Q.    But that's not what you did here; right?

A.    That's correct.  And there's ... good reason for not doing that.

Q.    Well, one of the reasons to do it that way, though –

A.    Let me –

Q.    – is because – no, but – I'll let you talk, just let me ask my
questions, because I'm really curious about this.

A.    Please.

Q.    The reason behind doing it that way, like not doing just a
two-thing matching, is that there was a concern that there's
like a – that you're creating like a matching game.  Am I
right, that was the concern behind it?

A.    Yes.  But it doesn't apply in this case.

Q.    And the reason you don't think it applies is because your
opinion, going into this case, was that the marks were
identical.

A.    You've got it, yes.

Q.    And, therefore, you developed a survey so others would
reach that same conclusion.

A.    That's correct.

Dkt. No. 34-4 at 18-20.  Dr. Seggev also indicated that he disagrees with the legal definition for

confusion and advocates for a different standard to evaluate confusion separate from existing

precedent: "I'm glad that I was asked to work on this because it gives me the opportunity to raise

some important questions about the veracity or the accuracy or the appropriateness of the entire issue of likelihood of confusion." *Id.* at 21.

Generally, when a party challenges a survey for bias, they are forced to use circumstantial evidence, such as leading questions or the use of images that are clearly intended to direct survey participants to a desired result. While it is generally understood that expert witnesses retained by the respective parties are going to provide their opinion testimony in a manner favorable to the party that retained that expert, such testimony is generally provided under the guise of being unbiased. Here, however, we have Plaintiff's expert, admitting under oath, that he created and conducted the Survey in the manner he did for the express purpose of ensuring the Survey participants agreed with him that the marks at issue "were identical." By Dr. Seggev's own admission, the Survey was injected with his own bias and results oriented, making the Survey inherently unreliable.

All surveys prepared for purposes of litigation by paid experts are to some extent result-oriented and this generally is not enough to warrant their exclusion. *See, e.g.*, *Malletier*, 525 F. Supp. 2d at 634 n.229. Here, however, Dr. Seggev created the Survey in a manner that ensured the outcome he was seeking.

Where a trademark action contemplates a jury trial, rather than a bench trial, the court should scrutinize survey evidence with particular care. As courts have noted:

> "The vast majority of reported cases dealing with problematic survey evidence have involved injunction hearings or bench trials. In such cases, the safest course for the trial judge is to admit the evidence and to treat the criticisms as going to the weight of the evidence.... This case is scheduled for a jury trial. The court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time-consuming, as this survey evidence would be, when it offers essentially nothing of real probative value. Rule 403 was written for just this sort of case."

21

*Kargo Global, Inc.*, 2007 WL 2258688, at *12 (quoting *Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1040 (S.D. Ind. 2000)).

A jury trial, rather than a bench trial, is contemplated in this case. If this case were to survive the pending cross-motions for summary judgment, the live testimony of Plaintiff's seasoned and impressively credentialed consumer confusion expert, regarding the results of the deeply flawed Survey, would prove to be "both powerful and quite misleading." *Daubert*, 509 U.S. at 595. The application of Rule 403 is clearly warranted in this case. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (finding survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion" in a motion for summary judgment); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (finding that "district court did not abuse its discretion [in excluding a survey] because it found the probative value of the survey so slight that it was easily outweighed, under a Rule 403 analysis, by the danger of confusion of the issues"); *Revlon Consumer Prods Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994) (finding survey "so unreliable that it is entitled to no weight"); *Exxon Corp. v. Xoil Energy Resources, Inc.*, 552 F. Supp. 1008, 1021 (S.D.N.Y. 1981) (affording survey no weight because the survey, among other things, was not "taken under market conditions").

Accordingly, Defendant's motion to exclude is granted.

**B.    Cross-Motions for Summary Judgment**

*1. Standard of Review*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.  *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000)).  Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration." *Morales*, 249 F.3d at 121 (citation omitted).

### 2. Plaintiff's Non-Federal Causes of Action

Defendant moved for summary judgment on Plaintiff's state-law causes of action, pled in counts four through eight of the complaint. *See* Dkt. No. 35-2 at 25-28. In its response, Plaintiff failed to address these counts or the arguments raised by Defendant. *See* Dkt. No. 46. Rather, for the first time in its response, Plaintiff asserts a claim under New York General Business Law § 368-d, which was not pled in the complaint. *See id.* at 24.

"'The burden is always on the movant to demonstrate why summary judgment is warranted. The nonmoving party's failure to oppose summary judgment does not shift that burden.'" *Leavitt v. Ethicon, Inc.*, 524 F. Supp. 3d 360, 367 (D. Vt. 2021) (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015)). However, "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014); *see also Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) (holding that "[b]ecause plaintiff's opposition papers did not address defendants' motion for summary judgment on [a] claim, [that] claim is deemed abandoned and summary judgment could be granted on that basis alone").

The Second Circuit has observed that:

> "[p]leadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them." And insofar as summary judgment "is known as a highly useful method of narrowing the issues for trial," it follows that "preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses." Accordingly, "[g]enerally, but perhaps not always, a partial

> response reflects a decision by a party's attorney to pursue some
> claims or defenses and to abandon others," and "a court may, when
> appropriate, infer from a party's partial opposition that relevant
> claims or defenses that are not defended have been abandoned."  If
> a district court so holds, it "should ... include a finding of
> abandonment of undefended claims or defenses."

*Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (quotation omitted).

Here, Defendant moved for summary judgment on all claims in the complaint and included argument as to why judgment in its favor was appropriate on all such claims.  *See* Dkt. No. 35-2.  In its counseled response and cross motion, Plaintiff fails to address (or even mention) any of its state law claims.  Accordingly, the Court finds that Plaintiff has abandoned the state law claims it pled in its complaint.

To the extent that Plaintiff attempts to assert a claim under New York General Business Law § 368-d, that request must be denied.  *See* Dkt. No. 46 at 24.  Initially, the Court notes that this cause of action was not pled in the complaint; rather, it was raised for the first time in Plaintiff's response and cross motion.  *See id.*  It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment.  *See Avillan v. Donahoe*, 483 Fed. Appx. 637, 639 (2d Cir. 2012) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment); *Shah v. Helen Hayes Hosp.*, 252 Fed. Appx. 364, 366 (2d Cir. 2007) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint") (citation omitted); *Wright v. Jewish Child Care Ass'n of N.Y.*, 68 F. Supp. 3d 520, 529 (S.D.N.Y. 2014) (citations omitted).  As such, the Court rejects Plaintiff's attempt to amend its complaint through its response to Defendant's motion for summary judgment.

Even assuming that this claim was properly pled, Defendant would still be entitled to summary judgment. As Defendant notes, New York General Business Law § 368-d is no longer a viable cause of action, being replaced by Section 360-l in 1996. *See Prince of Peace Enterprises, Inc. v. Top Quality Food Market, LLC*, 760 F. Supp. 2d 384, 388 n.2 (S.D.N.Y. 2011) (citation omitted). Even if Plaintiff meant to invoke New York General Business Law § 360-l, this statute was also not alleged in Plaintiff's complaint or disclosed during discovery. As such, the Court agrees with Defendant that this new cause of action must be dismissed.

### 3. Standing as Nunc Pro Tunc Assignee

Defendant contends that count one of the complaint must be dismissed because Plaintiff lacks statutory standing to bring a claim of trademark infringement relating to the DeLisle Logo because when this case was commenced, the DeLisle Logo was owned by Mr. DeLisle, individually, not Plaintiff. *See* Dkt. No. 35-2 at 7-8; Dkt. No. 57 at 11-12. Further, Defendant argues that Plaintiff's attempt to cure this deficiency by executing a *nunc pro tunc* assignment six months after the complaint was filed does not cure this defect in standing. *See id.* In response, Plaintiff argues that the cases on which Defendant relies are distinguishable because Plaintiff is controlled by a single individual (Mr. DeLisle) and there is no dispute between Plaintiff and Mr. DeLisle regarding title or interest in the mark. *See* Dkt. No. 46 at 9-10.

Under 15 U.S.C. § 1114(1), "any person who infringes on a trademark 'shall be liable in a civil action by the registrant.'" *Sream v. Saakshi Enters. Inc.*, No. 16-cv-1408, 2017 WL 2633510, *3 (E.D.N.Y. June 15, 2017) (quoting *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013)). "This cause of action is available ... only to 'registrant[s]' of the trademarks at issue, a term the [Lanham] Act defines as embracing the actual registrant's 'legal representatives, predecessors, successors, and assigns.'" *Fed. Treasury Enter. Sojuzplodoimport*,

726 F.3d at 72 (quoting 15 U.S.C. § 1127). "In other words, only registrants — as statutorily

defined — have 'statutory standing' to bring an action under Section [1114]." *Id.* (citing *Allen v.*

*Wright*, 468 U.S. 737, 751 (1984)). "This provision contrasts with Section [1125(a)(1)] of the

Act, which allows suits 'by any person who believes that he or she is or is likely to be damaged'

by the defendant's actions" *Id.* (quoting 15 U.S.C. § 1125(a)(1)). Standing is determined "as of

the commencement of suit." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992); *see also*

*Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 n.3 (Fed. Cir. 2010) ("While

[plaintiff] filed an amended complaint on November 16, 2007, we look to the date of the original

[c]omplaint ... because 'the jurisdiction of the [c]ourt depends on the state of things at the time of

the action brought'") (quoting *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993)); *Schreiber*

*Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005) ("The initial

standing of the original plaintiff is assessed at the time of the original complaint, even if the

complaint is later amended"); *L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11-cv-4187, 2013

WL 4400532, *12 (S.D.N.Y. Aug. 15, 2013) (stating, in case involving lack of standing to bring

trademark infringement claim, that "a declaration executed after the commencement of this action

cannot serve as the basis for standing"); *ID7D Co. v. Sears Holding Corp.*, No. 11-cv-1054, 2012

WL 1247329, *3 (D. Conn. Apr. 13, 2012) (holding, in a patent-infringement suit, that "standing

is to be determined as of the commencement of suit") (quoting *Paradise Creations, Inc. v. UV*

*Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003)).

Here, there is no dispute that Mr. DeLisle, the founder and president of Plaintiff, owned

the DeLisle Logo trademark in his individual capacity when it was registered by the USPTO on

June 24, 2008. *See* Dkt. No. 46-2 at ¶ 10. In his declaration in support of Plaintiff's motion for

summary judgment, Mr. DeLisle claims that on February 1, 2018, he formally transferred

ownership of the GRASSHOPPER GARDENS INC. & Design® and Grasshopper Design® trademarks, Nos. 3451872, issued on June 24, 2008, and 3377654, issued on February 5, 2008, including the associated goodwill and registrations, to Plaintiff.  This transfer was later documented through a *Nunc Pro Tunc* Assignment dated April 16, 2024." Dkt. No. 46-3 at ¶ 8. Notably, this conclusory assertion is not supported by any evidence or even an explanation as to how this alleged formal transfer even occurred or what prompted the decision to make the transfer.  The Court finds that this conclusory, self-serving statement is insufficient to create an issue of fact and finds that Mr. DeLisle was the owner of the DeLisle Logo at the time this litigation was commenced.  *See Cestaro v. Prohaska*, 681 F. Supp. 3d 121, 125 (S.D.N.Y. 2023) ("A conclusory contradiction of undisputed evidence in a self-serving affidavit, unsupported by other evidence, is not by itself sufficient to create a genuine dispute of material fact") (citations omitted); *see also BellSouth Telecommunications, Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ("'[A]n adverse party may not rest upon mere conclusory allegations or denials....  It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts'") (quotation and other citation omitted).

Since Mr. DeLisle was the "registrant" of the DeLisle Logo at the time this action was commenced, *see* Dkt. No. 35-1 at ¶ 11 (citing Dkt. No. 1-1; Dkt. No. 35-11), the issue becomes whether Mr. DeLisle's *nunc pro tunc* assignment of the DeLisle Logo to Plaintiff on April 16, 2024, is sufficient to confer statutory standing on Plaintiff.

As noted above, under 15 U.S.C. § 1114(1), a civil action to enforce a trademark may be brought by the "registrant," which embraces "legal representatives, predecessors, successors and assigns." 15 U.S.C. § 1127.  "At least two requisites are inherent in the concept of assignment under the Act: (1) the need for the relevant assigning document to be effected 'by instrument[ ] in

writing duly executed,' 15 U.S.C. § 1060(a)(3); and (2) the need for the assignment to transfer an ownership interest in the marks at issue." *Fed. Treasury Enter. Sojuzplodoimport*, 726 F.3d at 73. Here, Defendant does not contend that the *nunc pro tunc* assignment executed on April 16, 2024, does not meet the two requisites for a valid assignment. Rather, Defendant argues that, because the assignment occurred after Plaintiff commenced this action, it was not the registrant of the DeLisle Logo at the time it commenced this action and, therefore, lacks statutory standing to pursue its trademark infringement claim.

The Second Circuit has not specifically addressed whether *nunc pro tunc* assignment of a registered mark confers standing upon the assignee to sue. However, courts both within the Second Circuit and throughout the country have addressed this issue. The Federal Circuit has addressed this issue in *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774 (Fed. Cir. 1996), and more recently, in the patent infringement context, in *Alps South, LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379 (Fed. Cir. 2015). In *Gaia Technologies*, the Federal Circuit held that a *nunc pro tunc* assignment of patent and trademark rights did not confer standing on the plaintiff retroactively because the plaintiff "failed to come forward with the requisite evidence necessary to establish that an assignment, in writing ... took place before the lawsuit was filed." *Gaia Technologies*, 93 F.3d at 780 ("[P]arties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue") (quoting *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 310 (D. Del. 1995))). In *Alps South*, the Federal Circuit reiterated its holding that "[t]he party asserting patent infringement is 'required to have legal title to the patents on the day it filed

the complaint and that requirement [cannot] be met retroactively.'" *Alps South, LLC*, 787 F.3d at 1385 (quoting *Abraxis*, 625 F.3d at 1366).

Similarly, other courts that have considered the issue, including several district courts within the Second Circuit, have recognized the principle that a *nunc pro tunc* assignment after commencement of a suit cannot retroactively confer standing.  *See Shandong Shinho Food Industries Co., Ltd. v. May Flower International, Inc.*, 521 F. Supp. 3d 222, 264 (E.D.N.Y. 2021) (holding that the plaintiff company did not have standing to sue for infringement of a registered mark because it only received a *nunc pro tunc* assignment from its founder after the complaint was filed); *Spin Master, Ltd. v. E. Mishan & Sons, Inc.*, No. 19-CV-9035, 2019 WL 6681563, *9 n.8 (S.D.N.Y. Dec. 6, 2019) ("A party may not cure a standing defect by a '*nunc pro tunc*' assignment of rights that occurs after a plaintiff has filed suit") (quoting *Alps South, LLC*, 787 F.3d at 1384); *L'Oreal USA, Inc.*, 2013 WL 4400532, at *4 ("[A] *nunc pro tunc* assignment after the filing of a complaint cannot confer standing retroactively") (citing *Lujan*, 504 U.S. at 570 n.5); *see also Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 Fed. Appx. 803, 806 n.4 (5th Cir. 2020) ("We note, however, that *Gaia* did apply its holding to an accompanying trademark-infringement claim, ... and that an authoritative trademark treatise has cited *Gaia* for the proposition that '[i]f plaintiff is not the owner of the mark at the time suit was filed, that defect cannot be cured by a later assignment'") (quoting 6 McCarthy on Trademarks and Unfair Competition § 32:3 (5th ed. 2019)); *Cave Man Kitchens Inc. v. Caveman Foods LLC*, No. 18-cv-1274, 2020 WL 6874238, *4 (W.D. Wash. Nov. 23, 2020) (relying on *Gaia Technologies* to hold that a *nunc pro tunc* assignment did not confer statutory standing to sue because it "merely reflects that an alleged oral agreement was made ..., not that any type of writing was executed on that date").

In response to Defendant's motion, Plaintiff relies on cases that have concluded a *nunc pro tunc* assignment can be sufficient to confer standing in the context of an individual and his one-man shop.  For example, in *Jules v. Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146 (9th Cir. 2010), the Ninth Circuit concluded that, "[w]hen there is no dispute between the ... owner and transferee, 'it would be unusual and unwarranted to permit a third-party infringer to [require transfers to be in writing] to avoid suit for ... infringement.'" *Id.* at 1157 (quoting *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995)). Thus, the Ninth Circuit allowed an individual to sue for copyright infringement even though his one-man shop owned the copyright, because the one-man shop could have transferred the rights to the individual at any time.  *See id.*  In this context, the Ninth Circuit reasoned that "[c]opyrights, like any other property right, can be transferred by any means of conveyance.  A simple written note or memorandum of transfer signed by himself on behalf of [the one-man shop] would have been sufficient, and an earlier oral assignment can be confirmed later in a writing." *Id.* at 1156 (citations omitted); *see also Malovani v. Doe*, No. 11-cv-787, 2012 WL 12886493, *4 (C.D. Cal. May 14, 2012) (concluding that the plaintiff had standing to bring a trademark infringement claim because there was no dispute between the individual plaintiff and his one-man shop and, "[u]nlike *Gaia*, title could have been transferred easily from one to the other without any chain of title issues").

Here, the Court agrees with Defendant and the cases that have held that *nunc pro tunc* assignment, executed after the commencement of a case, is insufficient to confer standing upon Plaintiff.  *See Gaia Technologies*, 93 F.3d at 779-80; *Shandong Shinho Food Indus. Co.*, 521 F. Supp. 3d at 244; *L'Oreal USA, Inc.*, 2013 WL 4400532, at *11; *ID7D Co.*, 2012 WL 1247329, at *5.  Moreover, even assuming that an exception applies in the context of a "one-man shop,"

Plaintiff has not established that it is such an operation.  In fact, the evidence submitted supports
the opposite conclusion.  There is no evidence explaining any of Mr. DeLisle's duties and
responsibilities.  Mr. DeLisle's declaration fails to state that he controlled Plaintiff as a "one-man
shop" or that, he, alone, controls every aspect of, or makes all of the decisions for, Plaintiff that
would justify characterizing Plaintiff as a "one-man shop." Dkt. No. 46-3.  Mr. DeLisle admits
that he has over 100 employees and that Plaintiff's total revenue from 2016 through the date of his
declaration was $96,638,663.  *See id.* at ¶¶ 17-18.  And, in addition to Mr. DeLisle's declaration,
Plaintiff submits declarations from numerous executive level employees of Plaintiff, including its
Chief Financial Officer and Office Manager Jamie Farnsworth, Marketing Director Patrick
Mannix, and Human Resources Director Amy Quinn.  *See* Dkt. Nos. 46-71, 46-76 & 46-78.

  The mere fact that Mr. DeLisle was Plaintiff's "founder" and its current President is not
enough to find that Plaintiff is a "one-man shop."  In *Shandong Shinho Food Indus. Co.*, the court
rejected this very argument, refusing to find standing based on a *nunc pro tunc* assignment even
though the assignor was the founder of the company and there was not dispute between the
assignor and transferee.  *See Shandong Shinho Food Indus. Co.*, 521 F. Supp. 3d at 244.  The
court noted that it had no information regarding who controls the plaintiff, the role the owner
currently played at the company – "a company that provides products globally." *Id.*  As such, the
court found that the case was readily distinguishable from the "one-man shop" cases on which the
plaintiff relied.  *See id.*

  As in *Shandong Shinho Food Indus. Co.*, the facts before the Court are readily
distinguishable from the "one-man shop" cases on which Plaintiff relies.  Rather, the limited
information before the Court establish that Plaintiff has more than 100 employees, including
multiple executives, and produces millions of dollars in revenue per year.  As such, the Court

finds that, even assuming there is an exception for a "one-man shop," the exception is inapplicable to the present matter.

Accordingly, the Court finds that Plaintiff lacks statutory standing to sue under Section 1114(1) and grants Defendant's motion for summary judgment as to this claim.

### 4. Likely to Cause Confusion

Counts one through three of the complaint assert federal causes of action under the Lanham Act for federal trademark infringement (count one) and for federal unfair competition and false designation of origin (counts two and three).[6] *See* Dkt. No. 1 at ¶¶ 58-98.

"In order to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale ... or advertising of goods or services,' ... (5), without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (quotation and other citation omitted); *see also 1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 246 (2d Cir. 2024) (noting the elements for trademark infringement and unfair competition under the Lanham Act) (citation omitted). "In addition, the plaintiff must show that defendant's use of that mark 'is likely to cause confusion ... as to the affiliation, connection, or association of [the defendant] with [the plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [the plaintiff].'" *Id.* at 407 (quotation and other citations omitted). Claims for false designation of origin can be brought to enforce both registered and unregistered trademarks. *See Antetokounmpo*

---

[6] Count two focuses on infringement of the federally registered DeLisle Logo and count three focuses on federal common law infringement of the word mark GRASSHOPPER GARDENS, INC.

*v. Costantino*, No. 21-cv-2198, 2021 WL 5916512, *3 (S.D.N.Y. Dec. 15, 2021) (citing *City of N.Y. v. Blue Rage, Inc.*, 435 F. Supp. 3d 472, 485 (S.D.N.Y. 2020)).

To assess the likelihood of confusion, courts in the Second Circuit apply the eight factors outlined in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). The *Polaroid* factors include "(1) the strength of the mark; (2) the similarity between the two marks; (3) the proximity of the products and their competitiveness with one another; (4) the likelihood the prior owner may 'bridge the gap' in the markets for their products; (5) the evidence of actual consumer confusion; (6) the defendant's good faith in adopting its imitative mark; (7) the quality of the defendant's product compared with the plaintiff's product; and (8) the sophistication of the buyers." *City of New York by and through FDNY v. Henriquez*, 98 F.4th 402, 411 n.4 (2d Cir. 2024) (citing *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 136 (2d Cir. 2023)).

### a. The Strength of the Mark

In its motion, Defendant argues that Plaintiff's marks are weak and only entitled to a narrow scope of protection based on the existence of extensive third-party uses of the word "grasshopper" and of images thereof in the marketplace. *See* Dkt. No. 35-2 at 10. Further, Defendant notes that many of these third-party uses are related to lawncare and landscaping services and some of these third-party uses relating to lawncare and landscaping services actually predate Plaintiff's use. *See id.* (citing Dkt. No. 35-1 at ¶¶ 75-77). Based on this extensive third-party use, Defendant argues that the "strength of the trademark" *Polaroid* factor weighs heavily against a likelihood of confusion. *See id.*

In response, Plaintiff contends that its registration of its marks with the USPTO is *prima facie* evidence of the marks' distinctiveness. *See* Dkt. No. 46 at 13. Additionally, Plaintiff argues that the strength of its marks "further lies within the incongruity between the marks and the

services the Plaintiff offers, as the marks do not descriptively relate to landscaping, gardening, or outdoor construction.  Instead, the term 'Grasshopper' when used in this context, becomes arbitrary, invoking a sense of curiosity and memorability among consumers, as opposed to indicating a specific characteristic or function of the services offered." *Id.*

"'[T]he strength of a mark depends ultimately on its distinctiveness, or its "origin-indicating" quality, in the eyes of the purchasing public.'" *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022) (quotation omitted).  "The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength." *Id.* (citing *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993)).

Inherent strength or weakness of a mark is frequently an important factor because strong marks command a wider scope of protection than weak marks.  *See id.*  "Trademark law favors the use of marks that are arbitrary or fanciful in relation to the products [or services] on which they are used.  This is because such distinctive marks make it easier for the public to avoid confusion and because allowing the owner a broad exclusivity for such a mark detracts little from free expression, as other marketers of similar products [or services] have no justified interest in using such words to identify their products." *Id.* (citation omitted).  "In contrast, trademark law offers a much narrower scope of protection to marketers who seek to bar others from using words that describe or suggest the products or the virtues of their products." *Id.* (citation omitted).

"To describe different degrees of inherent distinctiveness, the trademark law utilizes four categories. In order of ascending strength, they are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *RiseandShine Corp.*, 41 F.4th at 120.  "A generic mark is a common

name, such as automobile or aspirin, that identifies a kind of product." *Id.* (citing *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993)). "A mark that consists of a generic identifier of the product receives no protection from the law of trademark, even if the mark has acquired public recognition as identifying the source of the product." *Id.* at 120-21 (citation omitted). Neither prior use, nor public recognition as a source identifier can justify denying others the right to refer to their product as what it is. *See id.* at 121.

"One rung above the unprotectable generic marks are descriptive marks. These are marks that 'tell[ ] something about a product, its qualities, ingredients or characteristics.'" *Id.* (quoting *Gruner*, 991 F.2d at 1076). "Descriptive marks are presumptively unprotectable, but can acquire a degree of protection if they have acquired secondary meaning, *i.e.* an acquired public recognition as a mark identifying the source." *Id.*

"Suggestive marks occupy the next higher rung. Suggestive marks suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage." *Id.* (citation omitted); *see also Gruner*, 991 F.2d at 1076 (noting that "ORANGE CRUSH," an orange flavored beverage, is an example of a suggestive mark). "They are the weakest marks that are protectable without need to show acquired secondary meaning." *Id.* "They receive a narrower scope of protection than the protection accorded to arbitrary or fanciful marks — those at the top of the ladder." *Id.* (citation omitted).

"Arbitrary and fanciful marks – *i.e.*, those that make no logical reference to the product or service on which they are used, such as Google for a search engine, Kodak for cameras, or Quilted Giraffe for a restaurant, receive the strongest protection." *RiseandShine Corp.*, 41 F.4th at 121 (citing *Gruner*, 991 F.2d at 1075). "This is because other marketers of the same products or

services have no justification or cognizable interest in using the same terms in referring to their own market offerings." *Id.*

Here, the Court finds that Plaintiff's marks are relatively weak and are only entitled to a narrow scope of protection. In its response, Plaintiff argues that its marks are arbitrary, thereby making them a strong mark. The Court disagrees. As noted above, arbitrary and fanciful marks make no logical reference to the product or service on which they are used. Plaintiff, however, provides, among other things, "[g]arden or flower bed care; Garden tree planting; Landscape gardening; Landscape gardening design for others." The word garden appears in both marks at issue, thereby providing a logical reference to the service being provided. Additionally, a garden is a logical place where one would potential find a grasshopper. At best, the marks are suggestive and thereby afforded a narrower scope of protection.[7]

Further weakening the strength of the marks is the extensive third-party uses of the word "grasshopper" and images of a grasshopper in the marketplace. As set forth in Defendant's motion, many of these third-party uses are related to lawncare and landscaping services and some of these third-party uses predate Plaintiff's use. *See* Dkt. No. 35-1 at ¶¶ 75-77 (setting forth over seventy (70) examples of third-party uses of the word "grasshopper" and/or an image of a grasshopper in connection with lawncare and landscaping services); *see also* Dkt. No. 46-2 at ¶ 75 (admitting Plaintiff's assertion that "[t]here is extensive third-party use of the word "grasshopper" and/or an image of a grasshopper in the United States in commerce, for both registered and unregistered trademarks for lawncare, landscaping, hardscaping, and snow removal, including longer than Plaintiff has been operating, and including in New York State).

---

[7] Defendant, however, has a much stronger argument that its marks are fanciful or arbitrary, because grasshoppers have no logical connection to anything having to do with heating and cooling services and products.

Based on this "extensive third-party use" of the word "grasshopper" and/or an image of a grasshopper for identical services offered by Plaintiff, with some such uses in the same geographic location and with priority over Plaintiff, this factor weighs in Defendant's favor. *See RiseandShine Corp.*, 41 F.4th at 123 ("Extensive third-party usage of a mark in related products [and services] generally weighs against a finding that a trademark is strong"). The word "grasshopper" and/or an image of a grasshopper is a weak source identifier for such services. *See Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 632-33 (S.D.N.Y. 2012).

Additionally, there were two federally registered marks directed to the trademark "GRASSHOPPER" for "riding power mowers" that were the basis of an initial refusal to register the DeLisle Logo during the application process before the USPTO. *See* Dkt. No. 35-1 at ¶¶ 8, 76(b). In response to this refusal, Mr. DeLisle argued that the DeLisle Logo did not create a likelihood of confusion over these registered marks. In his argument, Mr. DeLisle stressed that his relevant market for the services were "strictly for landscaping" and categorized as "lawn care" which were different than "riding lawn mowers." Dkt. No. 46-2 at ¶ 9. Based on these arguments, the USPTO allowed the DeLisle Logo to register. *See id.* at ¶ 10. Plaintiff is now attempting to broaden the defined market to be "home services" or "home maintenance" in arguing that there is a likelihood of confusion. Plaintiff should not be permitted to now broaden the previously defined market. *See City of New York by and through FDNY v. Henriquez*, 98 F.4th 402, 413 (2d Cir. 2024) ("What parties say about their marks matter. When a trademark holder makes one argument to the P.T.O. and then another to a court, the court has good reason to be skeptical"). As Defendant notes, courts have found persuasive cases where trademark holders assert scope-limiting statements before the USPTO in later determining the strength of that mark. For example, in *RiseandShine Corp.*, the Second Circuit found that a plaintiff's statements to the

USPTO about the narrow scope of its trademark weighed against finding that the mark was strong. *See RiseandShine Corp.*, 41 F.4th at 123 ("Now, having registered its trademark, Plaintiff argues that there is no such room for multiple "Rise" marks to coexist peacefully, even outside the coffee sector. That is not persuasive. If there was room for Plaintiff's use of "Rise" in the already crowded coffee field, there would also be room for Defendant's, especially on a product that is distinct from coffee").

Given the inherent weakness of Plaintiff's marks, the Court finds that this factor strongly favors Defendant.

### b. Similarity of the Marks

The "similarity of the marks" inquiry "looks to whether the similarity of the marks is likely to provide confusion among prospective purchasers." *Lang v. Retirement Living Pub. Co. Inc.*, 949 F.2d 576, 581 (2d Cir. 1991). This determination requires inquiry into "(1) whether the similarity between the two marks is likely to cause confusion, and (2) what effect the similarity has upon prospective purchasers." *The Sport Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 962 (2d Cir. 1996). This inquiry requires looking at not "just the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *Id.* "In making this determination, a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember." *Lang*, 949 F.2d at 581 (citation omitted).

Although at first blush the use of the same word may appear to weigh in favor of similarity, the use of the same words is far from dispositive, as the "court must focus on the overall impression conveyed by the use of the words." *Rush Indust., Inc. v. Garnier LLC*, 496 F. Supp. 2d 220, 226 (E.D.N.Y. 2007) (citing *Brennan's, Inc. v. Brennan's Restaurant, LLC*, 360

F.3d 125, 133 (2d Cir. 2004)).  This factor requires courts to look beyond the text and "analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) (citations omitted).

Here, the Court agrees with Defendant that the marks at issue are dissimilar because of the significant noted differences in the appearance of the marks and images and the use of additional words.  For example, the DeLisle Logo contains the colors green, yellow, brown, silver, and blue, which are claimed as a feature of the logo, and it contains the words "GRASSHOPPER GARDENS INC."  *See* Dkt. No. 57-1 at ¶¶ 4, 5.  Defendant's Logo contains the colors light blue, teal, white, blue, yellow, green, light green, navy blue, pink, black, and grey, which are claimed as a feature of the logo, and it contains the words "GRASSHOPPER," "HEATING," and "COOLING." *Id.* at ¶¶ 23-24.  Moreover, although both logos feature an anthropomorphic grasshopper, the designs are noticeably dissimilar.  The DeLisle Logo features a dark green grasshopper, facing to the left, holding a rake in one hand and a small gardening shovel in the other hand, with the words "GRASSHOPPER GARDENS INC." covering the lower half of its body.  *See id.* at ¶ 4.  Whereas Defendant's Logo features a light green grasshopper facing to the right, with its wings extended, wearing a baseball cap, and holding a wrench with the words "GRASSHOPPER," "HEATING," and "COOLING" printed on it.  *See id.* at ¶ 23.  These logos are visually significantly different and not likely to result in confusion.  *See Louis Vuitton Malletier*, 454 F.3d at 117 ("Utilizing a side-by-side comparison can be a useful 'heuristic means of investigating similarities and differences in ... respective designs,' so long as a court maintains a 'focus on the ultimate issue of the likelihood of confusion'") (quotation omitted).

Additionally, the admitted weakness of the word "grasshopper" and grasshopper imagery for lawncare and landscaping services plays directly into this *Polaroid* factor.  *See MidCap Bus. Credit, LLC v. MidCap Fin. Tr.*, 655 F. Supp. 3d 193, 207 (S.D.N.Y. 2023) ("Dissimilarity may be found where, as here, the only similarity is a common word or phrase") (citation omitted). Further, "[e]vidence of third-party use of similar marks on similar goods 'can show that customers have been educated to distinguish between different marks on the basis of minute distinctions.'" *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGGA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1374 (Fed. Cir. 2015) (quotation omitted).  Thus, the Court agrees with Defendant that Plaintiff's argument that the marks at issue are similar due to the shared use of the word "grasshopper" and use of distinct grasshopper logos is unavailing and ignores the indisputable admission by Plaintiff that the word "grasshopper" and/or grasshopper imagery are weak based on extensive third-party usage for the identical services of Plaintiff, including usages that predate Plaintiff's use and exist in the same geographic area.  *See* Dkt. No. 46-3 at ¶ 75.

Based on the admitted weakness of Plaintiff's marks and the numerous differences in each party's respective marks, there is no genuine issue of fact that supports a finding that Plaintiff's marks and Defendant's marks are similar.  Accordingly, this factor weighs in Defendant's favor.

### c. Competitive Proximity

The third *Polaroid* factor, proximity, concerns the extent to which the parties' marks compete with each other.  *See Savin Corp. v. Savin Grp.*, 391 F.3d 439, 458 (2d Cir. 2004). "'[D]irect competition between the products is not a prerequisite to relief[.]'" *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257 (2d Cir. 1987) (quotation omitted); *see also E.A. Sween Co. v. A & M Deli Express Inc.*, 787 Fed. Appx. 780, 785 (2d Cir. 2019).  "The competitive proximity factor has two elements, market proximity and geographic proximity.

Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products." *Brennan's, Inc. v. Brennan's Restaurant, LLC*, 360 F.3d 125, 133 (2d Cir. 2004). "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id.* When determining the likelihood of confusion, courts require less proximity between the goods or services if the senior user's mark is strong and the parties' marks are similar. *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002); *see also Katz v. Modiri*, 283 F. Supp. 2d 883, 896 (S.D.N.Y. 2003).

Here, the products and services offered by Plaintiff and Defendant are not competitive nor are they related because they are directed at different markets. Plaintiff exclusively offers lawncare and landscaping services and sells products for use in these services (*e.g.*, trees, perennials, mulch, grass seed, and ice melt). *See* Dkt. No. 46-2 at ¶¶ 2-3. In contrast, Defendant is an HVAC service provider that is focused on installing and repairing HVAC systems. *See id.* at ¶ 42. Plaintiff does not provide any HVAC services and Defendant does not offer any landscaping services. *See id.* at ¶¶ 6, 43.[8] There is not a single product or service that a consumer could purchase from both entities. *See id.* at ¶ 44. Thus, Plaintiff and Defendant are not competitors and are not targeting the same consumers. *See id.* at ¶¶ 6, 45. The services provided by Plaintiff and Defendant also differ in nature as Plaintiff provides landscaping services outside

---

[8] The Court notes that Plaintiff has alleged that Defendant has used its mark "in collaboration with Hedgehog Lawncare." Dkt. No. 46-2 at ¶ 43. Initially, the Court notes that Plaintiff is likely referring to a company called Groundhogs Lawn Care, as evidenced by an advertisement provided by Plaintiff. However, Defendant has submitted evidence establishing that it does not own or control Groundhogs Lawn Care, *see* Dkt. No. 57-2 at ¶ 7, and Plaintiff has simply demonstrated that Defendant may have jointly marketed its business with Groundhogs Lawn Care, among other companies, in a single advertisement. This is insufficient to establish that Defendant is engaged in a competitive business with Plaintiff.

and Defendant provides HVAC services for use and comfort inside. *See id.* at ¶¶ 23, 42. Plaintiff admits that it never lost a bid against, or lost any business, to Defendant. *See id.* at ¶ 4. Thus, Plaintiff, Defendant, and their respective goods and services doe not complete with each other.

Here, Plaintiff relies heavily on case law holding that less competitive proximity is required when the strength of the asserted mark favors the plaintiff. However, as discussed above, Plaintiff's marks are weak based on the extensive third-party use of the word grasshopper and/or grasshopper imagery for related and unrelated services and the suggestive nature of the mark. Therefore, these cases are inapposite.

Plaintiff also argues that the parties offer the same class of services. "In examining this factor a court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others." *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 161 (S.D.N.Y. 2011) (citations omitted). "Direct competition between the products is not necessary under this factor; it is enough that the products are similar in nature or sole in the same channels of commerce." *Id.* (citing *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003)). Plaintiff does not address any of these aspects of its and Defendant's businesses, but, instead, attempts to redefine the parties' services by claiming that both parties offer "home-improvement solutions." Dkt. No. 46 at 7. As Defendant notes, over time, Plaintiff has attempted to broaden the scope of its defined market apparently in an attempt to create competitive proximity.

For example, during prosecution of its logo registration, Plaintiff specifically defined the market to be "lawncare" and "landscaping services" in order to overcome pre-existing "grasshopper" registrations for lawnmower companies. Dkt. No. 46-2 at ¶ 9. In its complaint, Plaintiff defined the market in four different ways: "home maintenance services," "home

services," "home improvement services," and "landscaping services." Plaintiff is now trying to seek an even broader market by defining it as "home improvement solutions," which would conceivably be broad enough to include HVAC services. Plaintiff's new market characterization is so broad as to be completely meaningless and ignores the specific industry of "lawncare" Plaintiff relied upon before the USPTO. *See Mejia & Assocs., Inc. v. Int'l Bus. Machines Corp.*, 920 F. Supp. 540, 548 (S.D.N.Y. 1996) ("By increasing the level of generality, any products can be made to appear to fall in the same class. Aspirin and easy chairs could be characterized as "comfort products." Jet planes and roller blades could be characterized as transportation products. Such semantic exercises simply are not helpful in assessing likelihood of confusion").

Since Plaintiff's marks are weak and there is absolutely no competitive proximity between Plaintiff's and Defendant's respective services, this factor weighs heavily in Defendant's favor.

### d. Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).

Defendant has argued that there is no evidence that Plaintiff intends to "bridge the gap" and enter Defendant's service area. *See* Dkt. No. 35-2 at 18. In response, Plaintiff does not argue that it intends to enter Defendant's service area. *See* Dkt. No. 46 at 20-21. Instead, Plaintiff argues that there is actual confusion based on three instances of prospective and former clients demonstrating confusion regarding the services offered. *See id.* Plaintiff's reliance on hearsay and anecdotal evidence of actual confusion is unpersuasive.

As Defendant notes, bridging the gap and actual confusion are two different factors. Instead of actual confusion, bridging the gap refers to "the likelihood that the senior user will

enter the junior user's market in the future, or that consumers will perceive the senior user likely to do so." *Star Indus., Inc.*, 412 F.3d at 387.  The evidence upon which Plaintiff relies does not support the inference that the average consumer believes that Plaintiff is likely to enter Defendant's market by providing lawncare services.

Moreover, Plaintiff admits that it and Defendant do not offer any of the same goods or services, *see* Dkt. No. 46-2 at ¶ 73, that Plaintiff has offered the same lawncare and landscaping services over the past twenty-five years, *see id.* at ¶ 3, and that Plaintiff's only expansion plans are related to plant sales, *see id.* at ¶ 5.  Accordingly, the Court finds that this factor weighs heavily in Defendant's favor.

### e. Actual Confusion

"It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (citation omitted).  "Although 'actual confusion need not be shown to prevail under the Lanham Act,' ... '[t]here can be no more positive or substantial proof of the likelihood of confusion.'" *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 671 (S.D.N.Y. 2016) (quotations and other citations omitted); *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004).

"'Evidence of actual confusion may consist of anecdotal or survey evidence.'" *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 672 (quoting *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000)).  "To be relevant under the Lanham Act, the confusion must be of a type that 'could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.'" *Id.* (quoting *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991)) (other citation omitted); *see also Trustees*

*of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) ("[T]here is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions") (citation omitted).

Here, there is some evidence of actual confusion, but much of it is of little evidentiary value. First, Plaintiff relies on several supporting declarations from its own employees in which they recount one or more conversations with third parties, none of which were identified as witnesses in this case. While the Court does not doubt that these interactions occurred in the manner recounted by Plaintiff's employees, they are of limited evidentiary value given the lack of details surrounding the underlying interactions that were recounted. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001) (noting that, "[a]lthough anecdotal evidence is admissible to establish actual consumer confusion, ... it is within a district court's broad discretion to rule upon the admissibility of those anecdotes") (citations omitted).

Moreover, during the course of this litigation, Plaintiff produced approximately forty phone calls (in nearly two years) in which a person mentions Defendant during a call with Plaintiff. *See* Dkt. No. 46-2 at ¶ 67. However, Plaintiff receives approximately 1,000 inbound calls per week and 60-to-80 calls per day in the sales queue alone. *See* Dkt. No. 46-2 at ¶ 65. Thus, out of the approximately 104,000 calls Plaintiff received over the last two years, Plaintiff is relying on only 0.0003% to support alleged confusion. *See Lang*, 949 F.2d at 582-83.

Further, as Defendant notes, when the alleged details of the anecdotes are actually dissected, it is evident that most, if not all, do not support actual confusion under the Lanham Act. For example, fifteen of the alleged anecdotes involve either a prospective or current employee or a vendor. *See* Dkt. Nos. 46-4, 46-5, 46-22, 46-30, 46-33, 46-36, 46-40, 46-42, 46-43, 46-46, 46-72, 46-77, 46-78, 46-80 & 46-81. Trademark law, however, "protects against confusion in

46

consumers – not prospective employees or vendors." *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987); *see also Codename Enter., Inc. v. Fremantlemedia N. Am., Inc.*, No. 16-cv-1267, 2018 WL 3407709, *10 (S.D.N.Y. Jan. 12, 2018).  And an additional seven of the anecdotes are also not attributable, from the context, to consumers or prospective consumers of the services of either party.  *See* Dkt. Nos. 46-8, 46-18, 46-27, 46-39, 46-44, 46-75 & 46-78.

Of the more specific examples of alleged consumer confusion on which Plaintiff relies, several of the examples are not particularly relevant.  For example, Plaintiff alleges that Dorothy Sommer, Defendant's sales manager, received a phone call from a prospective customer during which "the customer inquired about the specific relationship between Plaintiff and Defendant." Dkt. No. 46-1 at ¶ 92.  Ms. Sommer responded that they are not affiliated but that Defendant "gets that all the time though." *Id.*  In addition to the above example, in the Shapiro Declaration, Plaintiff provided an additional twenty-eight examples of customer confusion that were recorded by Defendant's employees interacting with potential customers.  *See* Dkt. No. 46-85 at ¶ 6.  Of those twenty-eight examples, fourteen involved inquiries into the relationship between Plaintiff and Defendant.  *See id.* at ¶ 6 (Bates numbers 1221, 1223, 1224, 1228, 1229, 1231, 1233, 1240, 1243, 1244, 1246, 1247, 1248 and 1249).  Despite Plaintiff's reliance on these interactions, the Second Circuit has made clear that "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion.  Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself." *Nora Beverages*, 269 F.3d at 124.  As such, Plaintiff has provided only fourteen specific examples of customer confusion that are relevant to this inquiry, in addition to the remaining anecdotal evidence which is of little evidentiary value.  These limited examples – provided by

Plaintiff over the course of two years out of approximately 104,000 phone calls – is properly considered *de minimis* confusion and does not support Plaintiff's position.  *See BS Premium Holdings, LLC v. Premium Sweets & Desserts Inc.*, No. 21-cv-4872, 2022 WL 604064, *6 (E.D.N.Y. Feb. 28, 2022) (holding that between 109 and 149 instances chronicled by the plaintiff's employees of its customers asking about an affiliation between the plaintiff and the defendant is "*de minimis* anecdotal evidence"); *Girl Scouts of the United States of Am. v. Boy Scouts of Am.*, 597 F. Supp. 3d 581, 601 (S.D.N.Y. 2022) ("The fact that some instances of actual confusion exist does not preclude summary judgment, particularly when evidence in rebuttal provides a reasonable explanation discounting isolated instances of confusion"); *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 590 (S.D.N.Y. 2015) (holding that "[a] dozen or so inquiries spread over a period of time – and during the pendency of a litigation in which it can be assumed the company was actively on the look-out for any instances of actual confusion – are minimal" considering that the plaintiff had "over 17,000 online accounts").  And, an analysis of the remaining evidence does not support actual confusion under the Lanham Act.  Specifically, "(1) users accidentally 'tagging' [Defendant] on social media, while intending to tag [Plaintiff], or (2) [consumers of Defendant's services] mistakenly contacting [Plaintiff], while intending to reach [Defendant]," are "not cognizable instances of actual consumer confusion under the fifth *Polaroid* factor." *Reply All Corp. v. Gimlet Media, LLC*, 843 Fed. Appx. 392, 397 (2d Cir. 2021).  Rather, "these instances of general mistake or inadvertence – without more – do not suggest that those potential consumers in any way confused [the parties'] products, let alone that there was

confusion that could lead to a diversion of sales, damage to goodwill, or loss of control over reputation." *Id.*[9]

As such, the examples relied upon by Plaintiff are given little weight and any confusion was *de minimis.*[10] Therefore, this factor weighs in Defendant's favor.

### f. Good or Bad Faith Adoption of the Mark

The sixth factor examines whether the defendant "adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product [or service]." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004); *see also Girl Scouts of the United States of America v. Boy Scouts of America*, 597 F. Supp. 3d 581, 601 (S.D.N.Y. 2022) (citation omitted). "'Selection of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith.'" *Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d 373, 388 (2d Cir. 2005) (quotation omitted). Moreover, "[b]ad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Id.* at 389 (citation omitted). "Furthermore, in some cases even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, [the Second Circuit] has found the junior user to be in good faith." *Id.* (citations omitted).

---

[9] The Court also notes that Plaintiff admits that it has no evidence that (1) it lost a single sale to Defendant due to any confusion, (2) customers have been diverted to Defendant, or (3) customers have declined to use Plaintiff's services because of Defendant. *See* Dkt. No. 46-2 at ¶¶ 4, 70

[10] Even if the Court considered Dr. Seggev's report and the Survey, the Court would still conclude that the evidence of actual confusion is *de minimis*, given the significant flaws in the Survey as discussed in detail above.

Again, this factor weighs in Defendant's favor. The evidence establishes that Ms. Triolo employed KickCharge Creative when she decided to rebrand Defendant's business in early 2020. KickCharge conducted market research and sent Ms. Triolo various name options, ultimately deciding to select "grasshopper." Dkt. No. 46-2 at ¶¶ 24-25, 27-29. Ms. Triolo testified that she was not aware of Plaintiff's business or its marks when she first selected the name. *See id.* at ¶ 30. Before Defendant committed to use the name "grasshopper," it hired the Internicola Law Firm to conduct a trademark clearance search. *See id.* at ¶ 33. During the trademark clearance search, the Internicola Law Firm uncovered the '872 Registration for the DeLisle Logo. *See id.* at ¶ 35. Based on the results of the trademark clearance search, including the presence of the '872 Registration, the Internicola Law Firm provided a legal opinion to Defendant opining that Defendant could move forward with registering "Grasshopper" for HVAC services. *See id.* at ¶ 36. After receiving the search results and this initial analysis, Defendant "requested a further legal opinion from the Internicola Law Firm to confirm that there would be no issues with the use of its proposed marks if [Defendant] moved forward with the 'Grasshopper' name." *Id.* at ¶ 37.[11] Ms. Triolo further spoke with Mr. Internicola on September 14, 2020, to discuss his opinion regarding Defendant's use of the name "grasshopper." *Id.* at ¶ 40.

In its response to Defendant's motion, Plaintiff attempts to diminish the advice relied upon by Defendant by alleging that it initially came from a non-lawyer at the Internicola Law Firm. *See* Dkt. No. 46 at 24. However, the evidence clearly demonstrates that, although a legal assistant

---

[11] The Court notes that Plaintiff has denied this allegation, claiming that it "has insufficient knowledge or information to respond to the allegation." Dkt. No. 46-2 at ¶ 37. Defendant, however, has supported its claim with both Ms. Triolo's declaration and the email correspondence between the Internicola Law Firm and herself, which clearly demonstrates that she requested further assurances that there would be no issues with Defendant's use of the word "Grasshopper." Dkt. No. 35-3 at ¶ 8; Dkt. No. 35-17 at 2-5.

(Gina Fusco) initially provided an opinion based on the trademark search, *see* Dkt. No. 35-17 at 3-4, Mr. Internicola was subsequently consulted and agreed with the opinion provided, *see id.* at 2. Ms. Triolo further claims that she personally spoke with Mr. Internicola on the phone about this opinion. *See* Dkt. No. 35-3 at ¶¶ 10-12. Plaintiff's remaining conclusory assertions are insufficient to create an issue of fact as to this element. *See Lang*, 949 F.2d at 583 ("[R]eliance on the advice of counsel ... support[s] a finding of good faith"); *LVL XIII Brand, Inc.*, 209 F. Supp. 3d at 674 (holding that soliciting the advice of counsel, among other things, supports a finding of good faith, even where the defendant failed to submit evidence that it conducted a trademark search) (citations omitted); *Sports Traveler, Inc. v. Advance Magazine Pub., Inc.*, 25 F. Supp. 2d 154, 166 (S.D.N.Y. 1998) (same).

Accordingly, the Court finds that this factor weighs in Defendant's favor.

### g. *Quality of the Parties' Services*

The seventh factor of the *Polaroid* test the quality of the defendant's services. A marked difference in quality between the defendant's services and the plaintiff's tends to reduce the likelihood of confusion, but it may increase the chance of actual injury through dilution. *See Savin Corp.*, 391 F.3d at 461 (citing *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988)) (other citation omitted). "Conversely, where the junior user's [services] are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of dilution." *Id.* (citations omitted). Quality of service is distinct from competitiveness. *See Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993). "Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public goodwill earned by a well-established high quality product." *Id.* (citation omitted).

In its motion, Defendant argues that it provides high quality services and contends that Plaintiff's concerns regarding its reputation are entirely speculative and unfounded. *See* Dkt. No. 35-2 at 22-23. Defendant further notes that in 2023 the Dailey Gazette named it "the best HVAC services provider in the Capital District based on votes from its readership" and that it "has accumulated over [1,200] positive online reviews for its HVAC services." Dkt. No. 46-2 at ¶¶ 57-58.[12] In its response to Defendant's motion, Plaintiff does not address this factor directly, but makes general allegations that Defendant's use of the marks is harming Plaintiff's goodwill. *See, e.g.*, Dkt. No. 46 at 7-8. Because Plaintiff fails to address the quality of Defendant's services, the undisputed evidence establishes that Defendant provides quality services. Relatedly, assuming for purposes of this motion that Plaintiff provides services of comparable quality to those performed by Plaintiff, there is little risk of confusion as to source due to the different services offered and notable differences in the names of the companies and their respective marks. *See Morningside Grp. Ltd.*, 182 F.3d at 142 (noting the two distinct ways in which the quality of a defendant's services can be relevant when considering the seventh *Polaroid* factor).

Accordingly, the Court finds that this factor weighs in Defendant's favor. *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (holding that because the plaintiff failed to set forth any "evidence that it would be injured by being associated with" the defendant, the district court properly concluded that this factor favored the defendant); *Verilux,*

---

[12] Again, Plaintiff denies these allegations, without citation to the record, claiming it "has insufficient knowledge or information to respond to the allegations, and further notes that there is insufficient evidence for this allegation." Dkt. No. 46-2 at ¶¶ 57-58. Defendant, however, properly supported these allegations and they are deemed admitted. *See* Dkt. No. 35-22 at 2-4 (providing a copy of the Daily Gazette's 2023 "Peoples Choice Awards Best of the Best," which indicates that Grasshopper Heating & Cooling finished in first place); Dkt. No. 35-23 at 2-367 (providing 361 pages of positive reviews, with each page containing approximately 4 positive reviews).

*Inc. v. Hahn*, No. 3:05-cv-254, 2007 WL 2318819, *8 (D. Conn. Aug. 10, 2007) (holding that

because the plaintiff failed to address the quality of the defendants' product in a relevant manner,

this factor favored the defendant).

### h. Buyer Sophistication

The final *Polaroid* factor, "sophistication of the buyers," "'recognizes that the likelihood

of confusion between the products [or services] at issue depends in part on the sophistication of

the relevant purchasers.'" *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)

(quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 399 (2d Cir. 1995)).

"Generally, the more sophisticated and careful the average consumer of a product is, the less

likely it is that similarities in trade dress or trade marks will result in confusion concerning the

source or sponsorship of the product." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d

1033, 1046 (2d Cir. 1992) (citation omitted).  This factor does not necessarily turn on the

consumer's intellectual aptitude; rather, the inquiry asks how discerning a consumer will be in a

given purchasing decision.  *See Kohler Co. v. Bold Int'l FZCO*, 422 F. Supp. 3d 681, 730

(E.D.N.Y. 2018) (citation omitted).

"Consumer sophistication may be proved by direct evidence such as expert opinions or

surveys.  In addition, in some cases a court is entitled to reach a conclusion about consumer

sophistication based solely on the nature of the product or its price." *Star Indus., Inc.*, 412 F.3d at

390 (citation omitted).  For example, a consumer who purchases a relatively inexpensive,

everyday product is less likely to be discerning – and thus more likely to be confused – than a

consumer who purchases a relatively expensive, unusual product.  *See Kohler Co.*, 422 F. Supp.

3d at 731 (citing cases).

In its motion, Defendant first notes that, during the prosecution of the '872 Registration, Plaintiff admitted that the consumers of its services are "sophisticated purchasers" while arguing in support of registration over the refusal to register the DeLisle Logo based on the pre-existing "Grasshopper" marks for riding lawn mowers.  *See* Dkt. No. 46-2 at ¶ 9.  Defendant further contends that the sophistication of Plaintiff's and Defendant's customers can be inferred from the high costs of their respective services.  Defendant notes that both parties "offer high priced services where consumers exercise great care in selecting their service providers." Dkt. No. 35-2 at 23 (citing Dkt. No. 35-1 at ¶¶ 16-20, 54-56).  During his deposition, Mr. DeLisle acknowledged that Plaintiff targets individuals with an annual income of at least $150,000 because "people of that income level have money to spend on their properties or care to." Dkt. No. 35-13 at 2; Dkt. No. 46-2 at ¶ 17; Dkt. No. 35-6 at 6 (testifying that Plaintiff typically targets "middle income to high income homeowners" for its customers).  Plaintiff's average customer will spend between $1,000 and $2,500 per year on Plaintiff's services and 95% of Plaintiff's new customers will not hire Plaintiff over the phone, requiring an in-person consultation.  *See* Dkt. No. 46-2 at ¶¶ 19-20.  As to its own services, Defendant notes that the cost of its services are even higher than Plaintiff's, as HVAC service and equipment is one of the most expensive interior home costs for a homeowner.  *See* Dkt. No. 35-2 at 24; *see also* Dkt. No. 35-3 at ¶ 16.  Ms. Triolo notes that Defendant's customers generally spend an average of $10,000 per heating or cooling project.  *See id.*  Moreover, Ms. Triolo contends that Defendant encourages its customers to receive a number of bids from HVAC services companies before selecting Defendant and its customers typically follow this advice.  *See id.*

In response, Plaintiff makes the following argument: "[A]ssuming that all homeowners are sophisticated oversimplifies the reality that homeowners vary widely in their level of experience

and attention to detail.  As a result, not every homeowner is equally equipped to distinguish between marks that appear or sound alike." Dkt. No. 46 at 24.

Plaintiff's conclusory response fails to create an issue of fact as to this element.  Initially, Plaintiff does not even attempt to explain its statement to the USPTO arguing that its customers are sophisticated.  *See* Dkt. No. 35-10 at 25.  Moreover, as Defendant notes, both companies provide moderately expensive services, far removed from the inexpensive, everyday products where consumers are likely to be the least discerning.  Rather, each party offers a service that would be considered expensive and infrequently purchased.  *See Lion-Aire Corp. v. Lion Air Installation, Inc.*, 747 F. Supp. 3d 488, 514 (E.D.N.Y. 2024) ("The nature of the businesses and services provided suggest that residential customers, faced with the pricey cost of installing HVAC units, would likely exhibit a high level of sophistication"); *Kohler Co.*, 422 F. Supp. 3d at 732 (noting that courts typically find "that home fixtures are generally viewed as sufficiently expensive and infrequently purchased, such that consumer sophistication is relatively high") (citing cases).

Accordingly, the Court finds that this factor weighs in Defendant's favor.

### i. Balancing the Factors

"The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins.  Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany and Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020).  "The *Polaroid* factors are to be weighed holistically in determining whether the party seeking to establish an infringement claim has demonstrated the probability of confusion of a substantial number of consumers of the relevant class." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 366

(S.D.N.Y. 2003).  "[T]he Second Circuit has explained that strength, similarity, and proximity are generally the three most important *Polaroid* factors." *Bath & Body Works*, 7 F. Supp. 3d at 399 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).

Here, the Court has found that all of the *Polaroid* factors weigh in Defendant's favor and that two of the most important factors (strength of the marks and proximity) weigh heavily in Defendant's favor.  As such, Plaintiff has failed to raise a genuine issue of material fact with respect to likelihood of confusion and Defendant is entitled to summary judgment on Plaintiff's claims brought under the Lanham Act (counts one through three).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Defendant's motion to exclude the expert report and testimony of Dr. Eli Seggev (Dkt. No. 34) is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 35) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross motion for summary judgment (Dkt. No. 46) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 23, 2025
      Albany, New York

Mae A. D'Agostino
U.S. District Judge